Good morning, Your Honors, and may it please the Court, Mary Christine Sengaila of Haines & Boone on behalf of Appellant MGA Entertainment, and I would like to reserve five of my 20 minutes for rebuttal, and I'll watch the clock. You've been here before, you know how this works. Yeah. This case is about a 20-year business relationship that turned sour after Viacom failed to regularly schedule and promote an award-winning TV series created around one of MGA's popular toy lines, La La Loopsie. The problems with the TV program had a domino effect in the relationship, impacting the parties' separate advertising agreements for La La Loopsie and for other MGA toy brands when Viacom suspended MGA advertising during the critical holiday season in an effort to force MGA to make its final installment payment on the co-financing agreement for the TV series. Does the case turn on whether or not the shows were regularly scheduled in the same time slot? Is that the grab-a-man of your complaint? Well, there are three separate contracts that are at issue on appeal. Viacom has one claim on the TV producing series, the co-finance agreement, and we have counterclaims. But what I thought I heard you say in your sort of overview is that sort of the core theory that MGA is pursuing here is that Viacom failed to regularly broadcast the series in the same time slot and on a regular basis, and that from that failure all these other breaches and failures flow. Yeah, in terms of the story of the relationship, everything kind of went downhill from there. But in terms of our arguments with regard to the co-finance agreement and Viacom's claims and our own counterclaims, we have two arguments. One is the regularly scheduled, which is... That was actually never defined in the co-financing agreement? It was not defined, no. But there was testimony from the president of the Nickelodeon kids and family division, Seema Zarghemi, and she testified that with her 30 years of experience in the industry, that regularly scheduled means every day or the same time every day, every week, for an extended period of time. I realize that's what she testified to, but she wasn't involved in the negotiations of the contract. Well, she did have initial discussions about the TV series with the CEO of my client, MGA Entertainment. Yeah, but that was before they negotiated the co-financing agreement. Well, but they may not have been directly involved in the negotiations of this agreement, but they were certainly overseeing them and knew what was going on in them. But even so, whether or not she was involved in it, that in interpreting what the contract term means, you can certainly look to industry standard and custom, and given her statement generally about what regularly scheduled to her meant given her time in the industry. But if she was overseeing it, she could have had that defined in the contract. So it kind of dropped the ball because it's not defined. Well, it is not expressly defined in the contract, but parole evidence. And I have to confess, being from Washington, although I did take the California bar, I hate to admit how many years ago, but I know there's a big difference between California law and parole evidence. But are you saying that the phrase is ambiguous and that, therefore, her interpretation of the phrase is admissible to show an ambiguity in the contract? Well, that would be one argument is that at worst it's ambiguous, which leads to some travel issues with regard to different extrinsic evidence that we have about what the terms mean. And to be sure we're clear on the term, I'm looking at ER 691. It says that broadcasts of programming on either the main Michelodian channel or the Nick Jr. channel on a regularly scheduled basis during the hours 8 a.m. to 9 p.m. for three years, per end subject to customary resting periods, comma, which shall not be longer than three consecutive months per end, period. Right. It's the regularly scheduled basis. And that term is not defined. Correct. But didn't they actually run it more often than what they were contractually obligated to do? So where's the harm? Well, I think that the question is kind of pulling back and looking at the purpose of this entire arrangement. So the purpose of this entire arrangement was to promote a hit series and a ratings hit. And why would that be? That's because that assists Viacom in terms of its ad rates. It also, in this case, gives Viacom some upside if the toy sales increase as a result of that. And for MGA, it promotes their brand overall and also promotes their sales. So if you're looking at that overall in terms of what you're trying to do and the testimony of our expert as well, in terms of this is how you do it, is that you get kids interested in the brand. More than half of the children who purchase Lollaloopsy dolls did so because they saw the TV series first. So you want to get them engaged with the brand. You keep them engaged and get them interested enough to buy a doll because they know that at 3 p.m. every weekday it's going to show up. Well, that's the idea. So let's get past the dispute over regularly scheduled. I mean, to me, that seems there's plain language is frequently. And then perhaps there's a common understanding on how frequently it has to be aired. But I'm struggling to see the damage, the linkage between the alleged failure to regularly schedule Lollaloopsy and the alleged harm, which is the declining sales, because they've got an analysis based on their expert that there's no direct linkage. And I didn't see any attempt to counter that or to affirmatively demonstrate that there was a causation issue, linking the lack of scheduled showings or regular showings to the declining sale of dolls. And so isn't that fatal to your claim under the co-finance agreement if you can't demonstrate causation for damages purposes? Well, I think there are three different responses to that. The first is that to the extent it is Viacom's claim under the co-finance agreement, it is their burden to produce evidence with regard to causation for their damages because that's their affirmative claim. So as to that, that's not our burden. But with regard to our counterclaim, which is based on the regularly scheduled and our own breach of contract and our breach of the implied covenant of good faith and fair dealing claims, then we would, in response to their summary judgment of motion, have to point to some evidence that would support that. Well, I have the same concern Judge Nguyen has. They hired an expert who performed a regression analysis, and their expert opined that on the basis of the regression analysis, there was no nexus shown. You did not counter that with your own expert, did you, to say that, to conduct a similar analysis to say no there is, or to somehow show there was a flaw in Viacom's expert's opinion? Well, first of all, we did have an expert with regard to causation and damages. But not one designated for the causation issue? Is that right? No, we had an expert with regard to damages who provided us a supplemental report with regard to damages and the impact of the toy sales from the TV series. And so there is an expert. I don't know that we need an expert with regard to causation. But I thought that's what the regression analysis by Viacom's expert addressed, was whether or not there is a correlation between when the programs are scheduled and doll sales. Did I misunderstand the brief? Well, we do have our own expert who talks about the issues of the correlation as well. And I think that that correlation looks at not only the regularly scheduled aspect, but our other argument with regard to the implied covenant of good faith and fair dealing in terms of promoting the show. by encanting the doctrine of good faith and fair dealing under California law, can you? No, and we're not. Okay. Well, no. The observation that Judge Bennett made, which I think is right, that Viacom actually aired this program more than they were required to do under the contract. What evidence do you have to refute what I would consider to be two very strong pieces of evidence to show that there is no nexus between when the program is run and doll sales, therefore no damages? Well, I do think there is evidence in terms of our own, well, the overall purpose of the agreement to have the television show that kids get hooked on so then they buy the doll. If you get hooked on a television show, you have to know it's on and be able to see it regularly. So I think there's a common-sense aspect to that in terms of what a regularly scheduled program is. That's an argument, but I'm having difficulty understanding whether there's a genuine issue of material fact in light of the demonstration that Viacom made that there isn't a linkage given how often the series ran, even though it may not have been on Wednesdays at 3 o'clock in the afternoon for the entire period of the contract. Well, there is evidence that there were, over the three years, that there were 20 scheduling changes. So the question of in terms of whether it was regularly scheduled or not, it certainly seems that 20 changes would be sufficient for that. But it's not uncommon to move time slots, is it? I mean, as I read the records, some of the, I guess the shortest was what, about four months? And the longest was 16 between changes? Yes, although there were still variations within the 16-month period a little bit, within the timing a little bit. But there's also a second component to this besides the contract argument with regard to regularly scheduled, and that is the implied covenant, which was that yes, Viacom had the discretion to and the right to promote the property, and that there was evidence that, in fact, it chose to put its own properties above MGA's in terms of promoting it. And there's an internal e-mail indicating that during this process. Did you say, counsel, did I understand you to say that the expert supplemental report does address the correlation between the alleged breach and the declining sales? Because as I understand from the record, it doesn't address the correlation. So if I missed it, if you can provide an ER site, that would be very helpful. Yes, I think that I would say that it does to the extent that it talks about the way that young children get an interest in the doll, the fact that you need to – that the television program is integral to the toy sales and to the increase in toy sales, which is what the parties anticipated. They had their own projections. But to the extent of it, I don't think that that's too tenuous of a nexus. I think it has to be a more direct correlation than that to the declining sales or the lack of MGA's ability to meet projected sales targets for the affected years. Even by inference, I think that would be too tenuous. Well, I mean, whether that is the inference that ultimately will prevail or should prevail is a different question here. It's in terms of whether that creates a jury question. Do you want to address the other agreements? No, no, I was just agreeing whether there's sufficient evidence to create a genuine issue of material fact on which the jury is going to have to resolve conflicting evidence. We've got a couple of more agreements. Yeah, there's a couple more. I wanted to make sure that I fully rounded out the co-finance agreement, though, before – Can I ask you one question about co-finance before you turn? Sure. I made notes indicating that Viacom aired the program more than 1,700 times during the three-year period, but that's ten times more than what they were required to do under the contract. Did I misread something? They were only required to do it 156 hearings under the contract. They did it 1,700 times. Well, that gets back to the question of what do you mean by regularly scheduled and, you know, what are the factual questions? Well, we work learners like three in the morning, you know, where all they have are exercise videos on TV. Unfortunately, I'm a bad sleeper. I mean, they ran it during appropriate times where kids watch TV, right? They were at varied times, anywhere from seven in the morning until, yes, six or seven in the evening. But that's what the contract allowed. Well, I believe there's a question about that. We're disputing this. I feel like somebody needs to find a fact here, and that's not what we do. So in order to properly do its job under the contract, Viacom had also negotiated for these non-exclusive promotional rights. And the decision of this court in Marseille establishes that a decision to intentionally divert promotional dollars towards a media company's own properties raises a fact issue on the Covenant of Good Faith and Fair Dealing. And here there's evidence that in connection with negotiations on the co-finance, Viacom admitted to MGA that we know that putting Lala Loopsie on our platform is not a good idea. And that Viacom's plans will have a negative impact on Dora the Explorer, one of their own properties, which Lala Loopsie had regularly outperformed in toy sales, and therefore they wanted more of a minimum guarantee from MGA. And then there were also the internal communications during the series run, revealing that Viacom decided to preserve its own money to promote its own properties and priorities rather than Lala Loopsie. And then you could put that evidence together with all of the scheduling changes, the effort to strong arm MGA into paying the rest of this contract by suspending its advertising during a critical period. And that further demonstrates a lack of good faith. And so as in the lock case, Viacom may have had discretion to promote the series under the contract, but in exercising that discretion and deciding whether and how to promote the series, it had to do so in good faith. You're down to a little over three minutes. You're free to use that time, but I just wanted to give you that reminder. Thank you. I just want to spend one minute addressing the international sales agreement and the beacon agreements. Those are the two remaining agreements, and those are the advertising agreements. So how does one year of 12 months somehow get extended to 16? Special math. Creative lawyering. So with regard to that question on the international agreement, there are a couple of different ways. Actually, there's three months and then three months. So three months with regard to when you're airing the program, whether it means you need to. Does the 12 months run from the very first date you air the program in one region or all regions? Well, let me ask the question a different way. If we were just looking at the British market, would you agree that the 12 months would run from the date of the initial broadcast in Great Britain? Well, except that you have to go back to the term. Yes, in terms of, was that 12 months? Yes. But the question would be in terms of the agreement. So then your argument is if it was three months later that they started in Russia, then the year, it resets the clock and the year runs beginning three months later, and therefore extends to what amounts to 15 months after they started in Great Britain. Correct. But even within 15 months, did MTA spend all of the advertising that's required? No, they spent about $4.2 million at that point. And then the next three months comes from the delayed performance question. That gets to the question of whether that breach is somehow excused. Got your arguments on that on the brief. Okay, yes. And then the one point I wanted to make that runs across both International and Beacon has to do with damages. And there is at least a travel issue with regard to Viacom's damages on both of these advertising agreements, because there is evidence in the record that in the fall 2015 period that Viacom was in fact sold out of advertising. And therefore it would appear that attempting to recover that money from MGA when it had already, you know, had obtained that money from others would be a bit double-dipping. I thought Viacom's response to that was we're not seeking the $380,000 that we generated through resales to somebody else of those time slots. That's right. They did do that. They did do that. But the evidence in the record also indicated that they basically had unfilled time slots, even though they tried to mitigate to the tune of $380,000. Well, there is also testimony that they were sold out during this period of advertising, and the international agreement was focused for MGA on television advertising and that that was sold out. I thought the contract speaks across the full spectrum of social media, television. It talks about digital, but it clearly indicates, and there is testimony from Viacom's own representatives, that they understood that the priority for MGA was television to go with the broadcasting of the series, and that that's what we plan to do. And what people say in depositions, and that deposition testimony can't contravene the language of the contract, can it? Well, except in terms of the question of did we, you know, did they fail to, did they actually mitigate their damages by selling these elsewhere and making their money up elsewhere? That's the question. May it please the Court, Richard Kendall on behalf of Appellee Viacom International. The first point I would like to make responding has to do with the testimony of Seema Zarghami. That testimony, as Judge Bennett pointed out, for starters, had nothing to do with anything said in any negotiations. The record is absolutely clear that Ms. Zarghami was not involved as a participant in negotiations. Secondly, the... So does that mean it can't possibly be parole evidence? No, it doesn't mean it can't possibly be parole evidence if it rose to an expressed understanding that was provided to the other side by somebody else. However, an unexpressed understanding is inadmissible. Furthermore, there is no evidence whatsoever in the deposition record, which is where this comes from, that Ms. Zarghami was describing a custom and practice in the industry. It is clear from the deposition that she was talking at the end of a lot of questioning about a personal understanding that she had. But finally, and perhaps most important, what she said, if you read the deposition testimony, is that the program had to be scheduled in a regular pattern for an extended period of time. And Judge Bennett, as you pointed out, there's no question that this program was scheduled and, in fact, exhibited in a regular pattern for an extended period of time. In the total period of time from 2013 to 2015, as you pointed out, except for the summer changes, which were designed to accommodate kids' summer vacations, there were actually three changes. So first it aired in the summer of 2013 until August. Then it changed from August to February, more than six months, changed times. And then it aired for 16-and-a-half months, Judge Bennett, as you pointed out, in February 2014 to July 2015, when it switched again for summer change. And then it switched back in August for seven months until the series ended. So there are very few changes, and all of those are extended periods of time. And, as all of you have pointed out, there was, in any event, absolutely no effort whatsoever to correlate any harm to any of those scheduling changes, and, in fact, Viacom substantially overperformed. The next point I want to respond to is this argument on promotion, that Viacom shifted assets. Now, first of all, this contract, unlike some entertainment contracts, does not obligate Viacom to do any promotion whatsoever. And, furthermore, it doesn't contain an equal treatment clause, like some contracts do, that we have to treat all of our properties identically. But, in all events, this testimony that they use, which is in the record at ER 753, has been grossly misrepresented, because it does not say, and there is no evidence, that Viacom ever did shift resources. This witness wrote a memo in which she discussed the possibility of doing that, but there's no evidence that Viacom ever did shift resources. There's no evidence that any resources were ever shifted. And, as has already been pointed out by the panel, there's no obligation in the agreement to promote. The parties did discuss promotion, they granted each other rights, which, of course, are the intellectual property rights necessary to use a clip or something to promote. But, there was no obligation to promote, and the implied covenant cannot expand the obligations under the agreement. Unless there are further questions on the co-financing agreement issues, I'll move to the advertising issues. On the advertising issue, can you address the mitigation question? Yes. Now, first of all, it's important to point out that there are two advertising contracts, and the mitigation issues are different as between them. So, one is a domestic advertising contract, and the other is an international advertising contract. On the domestic advertising contract, it's undisputed that Viacom did mitigate to the extent of $380,000, and that there's about another $800,000 in the contract that it was unable to mitigate. Now, mitigation, of course, is the burden of MGA, to establish a failure to mitigate. And, for starters, there's a legal question as to whether there was any obligation to mitigate at all. Because, remember, as the court below found, the contracts here were non-cancelable. What does that mean? That means that there is a term that you cannot cancel. Why is that? It's because it's very difficult to mitigate on the fly in these situations. So, there is case law in California, which we've cited in the brief, the Valley de Oro Bank case, and the Ash against Su Ling Lung case, which say that the doctrine of mitigation does not apply when the effect would be to act as a sword against a right specifically protected by contract. To shift the burden of cancellation to Viacom defeats the non-cancelable term. MGA also does not address the PeopleSoft case that the district court cited in its order, which, again, is dispositive that mitigation is not required when it would nullify a contract term. But, beyond that, there's also no evidence that they have put into the record, no specific facts, as they are required to do in order to raise an issue that defeats summary judgment, that Viacom had any other buyers for any additional portion beyond this $380,000 that they were able to resell. No evidence as to what a hypothetical buyer would have paid for the canceled advertising. No evidence that Viacom benefited from the canceled advertising. And no evidence that Viacom's failure to achieve more than $380,000 worth of mitigation was unreasonable under the circumstances. And this was all MGA's burden, because they had to introduce evidence from which a reasonable jury would be able to make a decision. And a reasonable jury could imply a duty to further mitigate in a particular amount, which they didn't do. Normally, if you have a battle over mitigation, an expert comes and says, there were the following opportunities available of which they took no advantage. And, you know, there was another buyer who could have paid X, would have paid X. There's no evidence in the record whatsoever, they made no effort, they just threw it against the wall and speculated. Now, international advertising is the next issue. Again, of course, MGA has the burden of showing a lack of mitigation. Now, here the contract was different than in domestic. In domestic, MGA purchased particular advertising spots, as did other advertisers purchase particular advertising spots. And there is a finite inventory of time on television, so you can say there are X number of advertising spots domestically. However, that's not how it works internationally, according to the undisputed evidence. The undisputed evidence internationally is as follows. Instead of selling a means, like a TV spot on TV of advertising, Viacom sells eyeballs, that word in the industry, across all media. Eyeballs? Eyeballs, yes. Views across all media. And so let's assume that there's advertiser X, not MGA, but advertiser X, who purchases X thousand views. Viacom is permitted, according to the undisputed testimony, to provide those views in the form of Internet, in the form of television, in any form on any Viacom property, any Viacom network that it wants to. What this means is that Viacom can use dynamic pricing to try to attract the maximum amount of advertising across all of its media. And it can shift advertisers, unless they specify, and there's no way to do that, that it's going to shift advertisers. There's no evidence in the record that these other advertisers did specify particular locations. They can shift them at will, from TV spot to Internet. What this means, according to the undisputed testimony, is that Viacom is always elastic as to the number of TV spots that it has. The undisputed testimony is that Viacom had, whether MGA paid its $5 million or not, it was always elastic. It had, whether MGA paid its $5 million or not, plenty of excess TV spot capacity, as well as other media capacity. So when they didn't pay their full $5 million, that was a dead loss to Viacom, and it was not something that could be mitigated. Now, if they wanted to contest that evidence, they could have submitted evidence of their own. If they had some expert who could have said otherwise, if they had achieved it through cross-examination, but they didn't. But there is no evidence to contradict what I just said. No actual evidence in the record. Furthermore, on the meaning of the agreement, this came up. So the question was, we had a broadcast in the UK in July, and that, according to Viacom, started the 12-month clock. They want to argue, no, because broadcasts continued in other territories until the initial broadcasts continued until October, and therefore that extended the clock from a 12-month clock to a 15-month clock. Now, there are a number of things that are wrong with that argument. The first thing that's wrong with the argument is that in the broadcast agreement, which is where Viacom took on its obligation, Viacom agreed... I'm sorry, let me start. I think it's more logical to start with the advertising agreement. In the advertising agreement where MGA promised to spend $5 million within a year, the word is to start that 12-month period from the first telecast, singular... The initial telecast of the program in the TV's licensed territory. Right. So the initial telecast, you're saying, in the TV territory, that's the airing in the UK. Right. It's not a plural term. So obviously there were going to be other telecasts in other territories, but this is from the initial telecast in those territories. And there is no wording whatsoever that suggested that this would be floating for however many months it took to finish the telecasts in the UK. The second thing is that Viacom in the broadcast agreement, which is a separate agreement, negotiated at the same time, negotiated for flexibility to broadcast not for 12 months, but for actually up to 16 months. And the reason they did that was that in many of these territories there needs to be foreign language dubbing and other complications in delivering the programming. So Viacom reserved the flexibility to broadcast episodes as late as 15 months after the initial telecast. That's at 7 ER 1016. And Viacom was entitled to take commercial reasonably steps with respect to these broadcasts. That's at 7 ER 1035. So there was always a de-linkage between the 12-month period that was set forth in the International Advertising Agreement, which delineated MGA's obligation, and the obligation to broadcast that was owed by Viacom, which was a 12-to-be-extended-up-to-16-months period until October 31. And yet the parties never said in either of the agreements, well, these periods have to match. There was no linkage between those periods drawn in the agreements, although, of course, it would have been easy to do so. It would have been easy if MGA had cared about this issue at the time to say, well, if you're going to delay your program airing, then we get to delay our payments. But, of course, that wasn't done. And then on top of that, they didn't pay even within that period, the 15-month period in which, on their case, the airing occurred. The other thing I wanted to mention, going back to the co-financing agreement, but also this whole dispute, the argument that was made to you at the beginning is everything came off the track because of the regularly scheduled issue. That's actually not true, and it's clear that it's not true in the record. And if you look at Judge Reill's order, you'll notice that he spends four full pages at the beginning of his order on the co-financing agreement talking about what was the reason why things went off track and what was their principal complaint and what was the sole basis of their experts' report, an argument they have now abandoned. Their initial argument was that Viacom should not have been allowed to move the program from what's called Big Nickelodeon to Nickelodeon Junior. Big Nickelodeon is for a kid range that's somewhat older than Nickelodeon Junior, which is for littler kids. That was their primary argument in the case. That was the basis on which their expert, although he never tried to establish causation, all efforts at correlation he made, paltry and misguided as they were, were based on this change from Nick to Nick Junior. That was true of his first report and his supplemental report. Of course, the contract said explicitly that we were allowed to move the program from Big Nick to Nick Junior. Of course, they have abandoned that argument on appeal. To suggest that things went off track because of the regularly scheduled issue on Nick Junior, that's just not the case. It's not borne out by the record. If your honors have any further questions of me, I'm happy to answer them. Judge Baldwin? One minute. Mr. Kendall argued that it was not true that this was the core issue in this case, which is Viacom's bad faith. I think in my role as appellate counsel, it's called issue selection. We selected issues that we thought were the core issues and core appealable issues in the case. So we did not raise the issue that he mentioned. Looking at the timing sequence of events, it does roll from that point. The core of this case is the counterclaim, the bad faith, the implied covenant counterclaim. In that regard, with regard to causation, even though it's not required, the expert report does show that sales didn't meet expectations, that there was an undisputed connection between media exposure and toy sales. And a reasonable juror could infer that Viacom's breach led to fewer children watching the show and fewer toy sales. And in that regard, there is the argument with regard to regularly scheduling. But I think that linking that question to the causation analysis, that's a little bit narrow, because there are two claims. And with regard to the implied covenant claim, which relates to both promotion and regular scheduling as just an indication of the bad faith, then I think that's just too narrow a view in terms of the causation evidence for the bad faith claim. Thank you. Thank you very much, counsel, for both sides in your argument. The matter is submitted, and that's our last case, so we are adjourned for the day.
judges: Tallman, Nguyen, Bennett